**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Patrick Dawley, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.       I make this affidavit in support of an application for a search warrant for information associated with a certain Facebook account that is stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc. ("Meta"), a company headquartered in Menlo Park, California.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Meta to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with the account.

2.       I am a Special Agent with the United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), and have been since February of 2019.  I am currently assigned to the Manchester, New Hampshire Field Office in the Boston Field Division.  While training to become a Special Agent, I attended the Federal Law Enforcement Training Center ("FLETC") in Glynco, GA full-time for six-and-a-half months. During my time at FLETC, I received training in practices and methods of illegal firearm possessors, firearm traffickers, and related federal criminal statutes. Prior to becoming an ATF Special Agent, I was a Police Officer for the Reading, Massachusetts Police Department for approximately seven years.  As a Special Agent and Police Officer I have conducted and/or participated in a number of investigations involving state and federal firearm and controlled substance violations.  I have interviewed multiple victims, sources of information, witnesses, suspects, and defendants

regarding various types of criminal activity.  I have also served search warrants for various

crimes and have made criminal arrests for firearm and controlled substance violations. I

participated in state and federal investigations involving possession of illegal weapons including

firearms, improvised explosive devices and possession of controlled substances.  I also

conducted numerous investigative stops and probable cause searches of people and vehicles.  I

participated in physical surveillance operations and participated in the execution of state and

federal arrest warrants.

3.      The facts in this affidavit come from my personal observations, my training and

experience, and information obtained from other agents and witnesses. This affidavit is intended

to show merely that there is sufficient probable cause for the requested warrant and does not set

forth all of my knowledge about this matter.

4.      Based on my training and experience and the facts as set forth in this affidavit,

there is probable cause to believe that violations of 18 U.S.C. § 933 (firearms trafficking), 18

U.S.C. § 922(g)(1) (the unlawful possession of firearms), 18 U.S.C. § 922(g)(3) (the unlawful

possession of firearms), 18 U.S.C. § 922(g)(9) (the unlawful possession of firearms),  21 U.S.C.

841(a)(1) (distribution and possession with intent to distribute controlled substances) and 26

U.S.C. § 5681(d) (the unlawful possession of unregistered NFA firearms) have been committed

by Mackenzie BIMPSON ("BIMPSON"), E. Charles LAPLANTE ("LAPLANTE"), Michael

MILLER ("MILLER"), and Steve PEREZ ("PEREZ") and other unknown or unidentified

persons.  There is also probable cause to search the information described in Attachment A for

evidence of these crimes, as described in Attachment B.

**PROBABLE CAUSE**

5.     Along with other members of law enforcement, I am conducting an investigation of the M3 Cannabis Corp Drug Trafficking Organization ("DTO"), to include co-owners BIMPSON and MILLER, into the illegal possession and distribution of firearms and the illegal possession and distribution of drugs.

*BIMPSON's Criminal History*

6.     I reviewed BIMPSON's criminal history and observed him to have been arrested in New Hampshire, Maine, Vermont, and Massachusetts. I observed BIMPSON had numerous arrests to include: Theft by Unauthorized Taking (2015), Disorderly Conduct (2016), Burglary (2016), Receiving Stolen Property, (2016), Controlled Drugs (2016), Burglary (2017), Violation of Probation (2018), Domestic Violence Reckless Conduct (2019), Domestic Violence Assault (x2) (2019), Fugitive from Justice (2020), Violation of Conditions of Release (Possession of Firearm) (2020), Tampering with Witness (2020), Drug Possession (Marijuana and Butane Hash Oil) (2022), and Unsworn Falsification (2022).

7.     I observed BIMPSON was convicted of felonious Tampering with Witness in Oxford, Maine Criminal Court (Docket #OXFCDCR202000124) on August 14, 2020, which was punishable by more than one year imprisonment. BIMPSON was sentenced to one-year suspended sentence and two years' probation.

8.     I observed BIMPSON was convicted of Domestic Violence Assault in Oxford, Maine Criminal Court (Docket #OXFCDCR201900577) on August 14, 2020. BIMPSON was sentenced to 38 days of incarceration.

9.     I knew through my training, knowledge, and experience that BIMPSON had been a prohibited person from possessing firearms and ammunition since at least August 14, 2020, for his prior felony and misdemeanor crime of domestic violence convictions.

*Federal Search Warrant 23-MJ-171-01-TSM*

10.     On September 12, 2023, BIMPSON was arrested in Berlin, New Hampshire on an outstanding electronic bench warrant in the State of New Hampshire, by the New Hampshire State Police ("NHSP"). BIMPSON's Apple iPhone 13 Pro Max, bearing International Mobile Equipment Identity ("IMEI"), 356942214755608 ("BIMPSON's cellphone"), was seized pending a state search warrant for violations of criminal threatening.

11.     On September 26, 2023, I applied for and was granted a federal search warrant, Docket #23-mj-171-01-TSM, of BIMPSON's cellphone, signed by the Honorable Judge Talesha Saint-Marc, of the District of New Hampshire.  Attached hereto as **ATTACHMENT C** is a true and accurate copy of my supporting search warrant affidavit in #23-mj-171-01-TSM, which details relevant information obtained during the investigation. My supporting affidavit is further incorporated herein by reference for all intents and purposes.

12.     On September 27, 2023, at approximately 12:00 pm, I executed the search warrant and manually searched BIMPSON's phone, as well as obtained a forensic extraction of the contents of BIMPSON's cellphone for analysis.

13.     I know through reviewing BIMPON's cellphone extraction that the cellphone was activated around December 2021. I filed a preservation request for this account on September 5, 2023, through the Facebook Law Enforcement Online Requests Portal.

14.     I know through past observations during this investigation that BIMPSON owns Facebook account #522139785940237 with the display name "Felipe Xlii". I filed a preservation

request for this account on September 5, 2023, through the Facebook Law Enforcement Online Requests Portal.

15.     I know through past observations during this investigation that MILLER owns Facebook account #100069665209156 with the display name "Mike Miller."

*Source of Supply – Cocaine – Steve "Bebo" PEREZ*

16.     I know through reading text message conversations between BIMPSON's cellphone, 207-804-0872, and MILLER's known phone number, 603-616-9942, that BIMPSON and MILLER began to purchase large distribution levels of cocaine from a Source of Supply in New Haven, Connecticut around approximately March 24, 2022. I learned through BIMPSON and MILLER's conversation that their Source of Supply went by the nickname "Bebo" and utilized Facebook Account #100079155496337, with a display name of "Goldo Piketu." I filed a preservation request for this account on October 10, 2023, through the Facebook Law Enforcement Online Requests Portal.

17.     I observed BIMPSON's cellphone to have a contact "Bebo" with the phone number 475-343-0238. I know through a search through the Whooster commercial database, that the phone number is registered to Steve PEREZ.

18.     I observed booking and driver's license photographs of PEREZ compared to the profile pictures of "Goldo Piketu" and positively identified the Facebook account as pictures of PEREZ.

19.     I observed text conversations between BIMPSON's cellphone and PEREZ's phone number between the dates of July 1, 2022, and May 1, 2023. I observed large portions of the conversations were missing.  The likely explanation is that messages were deleted, as

BIMPSON texted to PEREZ on December 4, 2022, and stated "…I always delete these messages too."

20.     I observed the conversations between BIMPSON and PEREZ to be exclusively about BIMPSON supplying firearms, marijuana and/or cash to PEREZ in exchange for PEREZ providing cocaine to BIMPSON.

21.     I observed BIMPSON to utilize the Facebook Messenger Application[1] on his cellphone and frequently communicated with PEREZ via the "Goldo Piketu" account. Due to forensic restrictions to the phone, to include not connecting the phone to the internet, conversations between BIMPSON and PEREZ were only available between May 18, 2023, and September 11, 2023, the day before the cellphone was seized.

22.     I observed BIMPSON's cellphone texted MILLER's cellphone on October 27, 2022, and stated "Bebo just sent that" accompanied by a photograph of what appears to be, based on my training and experience, approximately (8) eight kilograms of cocaine.

23.     I did not observe any corresponding text messages with that date between BIMPSON and PEREZ and was not able to view Messenger messages prior to May 18, 2023. I know that persons involved in criminal activity often utilize numerous channels of communication, such as a variety of mobile applications. I know that mobile applications, such as Messenger, are often utilized in lieu of traditional SMS text messages, in an attempt to conceal criminal activity from traditional law enforcement investigative techniques. I know that BIMPSON and PEREZ utilized SMS messaging, Facebook Messenger Audio calls, and Facebook Messenger messaging.

---

[1] I know the Messenger Application to be a Meta product for messaging between Facebook accounts.

<u>*Source of Supply – Firearms – E. Charles "Chucky" LAPLANTE*</u>

24.     I know through reading text message conversations between BIMPSON's

cellphone and MILLER's known phone number, that BIMPSON and MILLER have utilized

"Chucky" as a source of supply of firearms since at least December 26, 2021.

25.     I observed BIMPSON's cellphone to have a contact "Chucky" with the phone

number 603-348-1037. I know through a search through the Whooster commercial database, that

the phone number is registered to E. Charles LAPLANTE.

26.     I observed text conversations between BIMPSON's cellphone and LAPLANTE's

phone number between the dates of March 6, 2023, and August 14, 2023. I observed

conversations between BIMPSON and LAPLANTE to almost exclusively be regarding the

procurement and exchange of firearms for cash or drugs.

27.     I knew through past observations during this investigation that LAPLANTE owns

Facebook account #6572981706055516, with the display name "Charles LaPlante." I observed

driver's license photographs of LAPLANTE compared to the profile pictures of "Charles

Laplante" and positively identified the Facebook account as pictures of LAPLANTE.

28.     I filed a preservation request for this account on September 17, 2023, through the

Facebook Law Enforcement Online Requests Portal.

29.     I observed Facebook Messenger communications between BIMPSON and

LAPLANTE between the dates of August 14, 2023, and August 17, 2023. I observed BIMPSON

to receive numerous email notifications, dating as early as October 8, 2021, notifying him that he

was receiving messages from "Charles Laplante" via the Messenger application.

30.     I observed LAPLANTE send BIMPSON a message on August 17, 2023, that

stated "Will I ever be seeing the money from that half pound outta that pound that I bought from

7

Gabe? I sacrificed one of my favorite pistols to buy that pound that day, as you know. And I even got shorted $50 from the sale to Orlando that day too."

## BACKGROUND CONCERNING FACEBOOK[2]

31.     Meta owns and operates Facebook, a free-access social networking website that can be accessed at http://www.facebook.com. Facebook users can use their accounts to share communications, news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

32.     Meta asks Facebook users to provide basic contact and personal identifying information either during the registration process or thereafter. This information may include the user's full name, birth date, gender, e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Each Facebook user is assigned a user identification number and can choose a username.

33.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

---

[2] The information in this section is based on information published by Meta on its Facebook website, including, but not limited to, the following webpages: "Privacy Policy," available at https://www.facebook.com/privacy/policy; "Terms of Service," available at https://www.facebook.com/legal/terms; "Help Center," available at https://www.facebook.com/help; and "Information for Law Enforcement Authorities," available at https://www.facebook.com/safety/groups/law/guidelines/.

34.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

35.     Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

36.     Facebook users can upload photos and videos to be posted on their Wall, included in chats, or for other purposes. Users can "tag" other users in a photo or video, and can be tagged by others. When a user is tagged in a photo or video, he or she generally receives a notification of the tag and a link to see the photo or video.

37.     Facebook users can use Facebook Messenger to communicate with other users via text, voice, video. Meta retains instant messages and certain other shared Messenger content

unless deleted by the user, and also retains transactional records related to voice and video chats. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.

38.     If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

39.     Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

40.     Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

41.     Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

42.     Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

43.     In addition to the applications described above, Meta provides users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

44.     Meta also retains records of which IP addresses were used by an account to log into or out of Facebook, as well as IP address used to take certain actions on the platform. For example, when a user uploads a photo, the user's IP address is retained by Meta along with a timestamp.

45.     Meta retains location information associated with Facebook users under some circumstances, such as if a user enables "Location History," "checks-in" to an event, or tags a post with a location.

46.     Social networking providers like Meta typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Meta about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Meta typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

47.     As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Meta, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a

11

residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Meta logs the Internet Protocol ("IP") addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, location information retained by Meta may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (*e.g.*, information indicating a plan to commit a crime), or consciousness of guilt (*e.g.*, deleting account information in an effort to conceal evidence from law enforcement).

48.     Therefore, the servers of Meta are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## **INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED**

49.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant

to require Meta to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## **<u>CONCLUSION</u>**

50.     Based on the foregoing, I request that the Court issue the proposed search warrant.

51.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.  The government will execute this warrant by serving it on Meta. Because the warrant will be served on Meta, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

52.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

**REQUEST FOR SEALING**

53.     I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Respectfully submitted,

/s/ Patrick Dawley
Patrick Dawley
Special Agent
Bureau of Alcohol, Tobacco, Firearms &
Explosives

Subscribed and sworn to me, telephonically, on October 13, 2023:

UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with the following Facebook accounts, that are stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc., a company headquartered in Menlo Park, California:

1. Facebook account #522139785940237 ("Felipe Xlii" /melvin.slime.7 – Mackenzie BIMPSON)

2. Facebook account #100079155496337 ("Goldo Piketu" – Steve PEREZ)

3. Facebook account #6572981706055516 (E. Charles LAPLANTE)

4. Facebook account #100069665209156 (Michael MILLER)

**ATTACHMENT B**

**Particular Things to be Seized**

I.      **Information to be disclosed by Meta Platforms, Inc. ("Meta")**

To the extent that the information described in Attachment A is within the possession, custody, or control of Meta, regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Meta, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Meta is required to disclose the following information to the government for each user ID listed in Attachment A:

(a)     All contact and personal identifying information, including full name, user identification number, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers;

(b)     All activity logs for the account and all other documents showing the user's posts and other Facebook activities from October 8, 2021, to October 10, 2023;

(c)     All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them October 8, 2021, to October 10, 2023, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

(d)     All profile information; News Feed information; status updates; videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification

numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(e)     All records or other information regarding the devices and internet browsers associated with, or used in connection with, that user ID, including the hardware model, operating system version, unique device identifiers, mobile network information, advertising ID, and user agent string;

(f)     All other records and contents of communications and messages made or received by the user October 8, 2021, to October 10, 2023, including all Messenger activity, private messages, chat history, video and voice calling history, and pending "Friend" requests;

(g)     All "check ins" and other location information;

(h)     All IP logs, including all records of the IP addresses that logged into the account;

(i)     All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

(j)     All information about the Facebook pages that the account is or was a "fan" of;

(k)     All past and present lists of friends created by the account;

(l)     All records of Facebook searches performed by the account October 8, 2021, to October 10, 2023;

(m)     All information about the user's access and use of Facebook Marketplace;

(n)     The types of service utilized by the user;

(o)     The length of service (including start date) and the means and source of any

payments associated with the service (including any credit card or bank account

number);

(p)     All privacy settings and other account settings, including privacy settings for

individual Facebook posts and activities, and all records showing which Facebook

users have been blocked by the account;

(q)     Records of any Facebook accounts that are linked to the account by machine

cookies (meaning all Facebook user IDs that logged into Facebook by the same

machine as the account); and

(r)     All records pertaining to communications between Meta and any person regarding

the user or the user's Facebook account, including contacts with support services

and records of actions taken.

Meta is hereby ordered to disclose the above information to the government within 14

days of issuance of this warrant.

**II.      Information to be seized by the government**

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of 18 U.S.C. § 933 (firearms trafficking), 18 U.S.C. § 922(g)(1) (the unlawful possession of firearms), 18 U.S.C. § 922(g)(3) (the unlawful possession of firearms), 18 U.S.C. § 922(g)(9) (the unlawful possession of firearms),  21 U.S.C. 841(a)(1) (distribution and possession with intent to distribute controlled substances) and 26 U.S.C. § 5681(d) (the unlawful possession of unregistered NFA firearms) involving Mackenzie BIMPSON, Michael MILLER, E. Charles LAPLANTE, Steve PEREZ and other unnamed or unidentified persons since October 8, 2021, including, for each user ID identified on Attachment A, information pertaining to the following matters:

(a)      The illegal manufacturing, procurement, purchase, possession, disposition and/or transfer of firearms and drugs. Any communications between BIMPSON, MILLER, LAPLANTE, and PEREZ in furtherance of firearms and drug trafficking.

(b)      Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

(c)      Evidence indicating the Facebook account owner's state of mind as it relates to the crime under investigation;

(d)      The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

# ATTACHMENT C

**AFFIDAVIT IN SUPPORT OF AN APPLICATION**
**UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE**

I, Patrick Dawley, a Special Agent with the Department of Alcohol, Tobacco, Firearms, and

Explosives ("ATF") being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I am a Special Agent with the United States Department of Justice, Bureau of

Alcohol, Tobacco, Firearms, and Explosives ("ATF"), and have been since February of 2019.  I

am currently assigned to the Manchester, New Hampshire Field Office in the Boston Field

Division.  While training to become a Special Agent, I attended the Federal Law Enforcement

Training Center ("FLETC") in Glynco, GA full-time for six-and-a-half months. During my time

at FLETC, I received training in practices and methods of illegal firearm possessors, firearm

traffickers, and related federal criminal statutes. Prior to becoming an ATF Special Agent, I was

a Police Officer for the Reading, Massachusetts Police Department for approximately seven

years.  As a Special Agent and Police Officer I have conducted and/or participated in a number

of investigations involving state and federal firearm and controlled substance violations.  I have

interviewed multiple victims, sources of information, witnesses, suspects, and defendants

regarding various types of criminal activity.  I have also served search warrants for various

crimes and have made criminal arrests for firearm and controlled substance violations. I

participated in state and federal investigations involving possession of illegal weapons including

firearms, improvised explosive devices, and possession of controlled substances.  I also

conducted numerous investigative stops and probable cause searches of people and vehicles.  I

participated in physical surveillance operations and participated in the execution of state and

federal arrest warrants.

2.     This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

**PURPOSE OF AFFIDAVIT**

3.     I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property— an electronic device as more fully described in Attachment A—which are currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

4.     Based on my training and experience, I submit that the facts contained in this affidavit establish probable cause to believe the Mackenzie BIMPSON ("BIMPSON"), and other known and unknown to the Government have committed violations of 18 U.S.C. § 933 (firearms trafficking), 18 U.S.C. § 922(g)(1) (unlawful possession of firearms), 18 U.S.C. § 922(g)(3) (unlawful possession of firearms), 18 U.S.C. § 922(g)(9) (unlawful possession of firearms),  21 U.S.C. 841(a)(1) (distribution and possession with intent to distribute controlled substances), and 26 U.S.C. § 5681(d) (unlawful possession of unregistered NFA firearms), and that evidence, fruits, and instrumentalities of these offenses, as well as evidence of the identify of any co-conspirator(s) will be found on the subject electronic device, as further described in Attachment B.

**IDENTIFICATION OF THE DEVICE TO BE EXAMINED**

5.     The property to be searched is an Apple iPhone (unknown model) smartphone ("Device").

6.     The Device is currently in the lawful possession of the New Hampshire State Police ("NHSP").  The Device came into the NHSP's possession in the following way: on

2

September 12, 2023, NHSP arrested BIMPSON for outstanding State of New Hampshire electronic bench warrants for unsworn falsification and possession of marijuana and/or hash. During the search incident to arrest, the Device was located within the direct control of BIMPSON, was later identified as his cellphone per BIMPSON's admission during a Mirandized interview, and was seized pending a State search warrant related to an ongoing investigation into a criminal threatening incident that had transpired a few days prior, on September 9, 2023.

7.      The Device is currently in storage at the evidence locker at NHSP Troop F in Twin Mountain, New Hampshire.  In my training and experience, I know that the Device has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the Device first came into the possession of a law enforcement agency, to include NHSP.

8.      The applied-for warrant would authorize the forensic examination of the Device in NHSP custody and any forensic data extractions of its electronically stored data as described more particularly in Attachment B.

**PROBABLE CAUSE**

9.      Along with other members of law enforcement, I am conducting an investigation of BIMPSON for violations of 18 U.S.C. § 933 (firearms trafficking), 18 U.S.C. § 922(g)(1) (unlawful possession of firearms), 18 U.S.C. § 922(g)(3) (unlawful possession of firearms), 18 U.S.C. § 922(g)(9) (unlawful possession of firearms),  21 U.S.C. 841(a)(1) (distribution and possession with intent to distribute controlled substances), and 26 U.S.C. § 5681(d) (unlawful possession of unregistered NFA firearms).

*Background*

10.      On August 30, 2023, ATF received a request for assistance from numerous

agencies related to BIMPSON and suspected firearms trafficking. BIMPSON is well known to

NHSP due to his extensive amount of law enforcement interactions, as well as numerous law

enforcement agencies in Northern New Hampshire (Grafton and Coos County) and Western

Maine (Androscoggin, Cumberland, and Oxford County).  BIMPSON's past contact with law

enforcement is generally related to drug distribution and suspected firearms possession and

trafficking.

11.      I learned from NHSP Sergeant Detective Sean Smarz, that on or about August 25,

2023, a source of information ("Source #1") contacted NHSP to provide information related to

extensive firearms and drug trafficking in Northern New Hampshire and Western Maine. Source

#1 voluntarily provided information, did not request, nor receive a monetary reward, and did not

receive favorable consideration for criminal cases. According to Source #1, their motivation in

providing information was for the betterment of society and disruption to criminal activity in the

community. Source #1 has known BIMPSON since approximately 2012 and was a former

associate of BIMPSON's drug trafficking organization ("DTO").

12.      I learned from Littleton Police Detective Bryce Lineman, that on or about August

29, 2023, Source #1 met with investigators of the New Hampshire Attorney General's Drug Task

Force ("NHAGDTF") and NHSP, to provide further detailed information related to drug

trafficking.

13.      On September 7, 2023, I conducted a telephonic debrief with Source #1 along

with NHSP Troop F Detectives and investigators with the NHAGDTF, to obtain further detailed

information related to firearms trafficking.

14.     During the debriefs, Source #1 provided consistent and credible accounts that BIMPSON was the leader of a DTO which primarily operated in Northern New Hampshire and Western Maine.  According to Source #1, BIMPSON and others in the DTO obtained firearms in Littleton, New Hampshire and disposed of the firearms in the Connecticut area to prohibited persons, such as drug dealers, drug users and known criminals, in exchange for distribution quantities of powdered cocaine. Source #1 also stated that BIMPSON disposed of firearms in Western Maine in exchange for drugs, to include marijuana.

15.     In both instances, BIMPSON then sold exchanged-for drugs and utilized the ill-gotten gains to fund firearms manufacturing by E. Charles "Chucky" LAPLANTE ("LAPLANTE") at his residence at 655 Hilltop Road, Littleton, New Hampshire. Source #1 stated LAPLANTE is a drug user of suspected cocaine and marijuana and has observed LAPLANTE consuming drugs with BIMPSON at his residence at 655 Hilltop Road, Littleton, New Hampshire.

16.     Source #1 stated BIMPSON was the co-owner of M3 Cannabis Corp. in Bridgton, Maine and had a multi-acre marijuana grow operation in Bethel, Maine, which wholesaled large quantities of outdoor-grown marijuana to local medical marijuana businesses in Maine, however BIMPSON and fellow co-owner Michael MILLER ("MILLER") of Littleton, New Hampshire, also brought large quantities of marijuana into New Hampshire to sell at premium prices to fund other endeavors through ill-gotten gains, such as firearms and drug trafficking in Connecticut.

17.     Source #1 showed corroborating videos, photographs, and messages on their cellphone ("Telephone #1"), which were received from BIMPSON's known cellphone numbers, 207-804-0872 and/or 207-595-2356, and/or his known social media accounts, such as Facebook account #522139785940237 with the vanity name "Filipe Xlii." Source #1 also showed

5

investigators numerous videos and photographs captured and stored on Telephone #1, in which Source #1 was present during the events and documented the events firsthand. Investigators asked Source #1 if they would consent to an extraction of Telephone #1, to which Source #1 agreed to do so at a later date.

*BIMPSON's Criminal History*

18.     I reviewed BIMPSON's criminal history and observed him to have been arrested in New Hampshire, Maine, Vermont, and Massachusetts. I observed BIMPSON had numerous arrests to include: Theft by Unauthorized Taking (2015); Disorderly Conduct (2016); Burglary (2016); Receiving Stolen Property (2016); Controlled Drugs (2016); Burglary (2017); Violation of Probation (2018); Domestic Violence Reckless Conduct (2019); Domestic Violence Assault (x2) (2019); Fugitive from Justice (2020); Violation of Conditions of Release (Possession of Firearm) (2020); Tampering with Witness (2020); Drug Possession (Marijuana and Butane Hash Oil) (2022); and Unsworn Falsification (2022).

19.     I observed BIMPSON was convicted of felonious Tampering with Witness in Oxford, Maine Criminal Court (Docket #OXFCDCR202000124) on August 14, 2020, which was punishable by more than one year imprisonment. BIMPSON was sentenced to one year suspended sentence and two years' probation.

20.     I observed BIMPSON was convicted of Domestic Violence Assault in Oxford, Maine Criminal Court (Docket #OXFCDCR201900577) on August 14, 2020. BIMPSON was sentenced to 38 days of incarceration.

21.     As a result of these convictions I know through my training, knowledge, and experience that BIMPSON had been a person prohibited from possessing firearms and ammunition since at least August 14, 2020, pursuant to 18 U.S.C. § 922(g).

6

*Voluntary Extraction of Telephone #1*

22.      On or about August 31, 2023, Source #1 voluntarily provided Telephone #1 to NHSP Troop F Detectives to have the contents extracted. Source #1 provided consent for law enforcement agencies to review the contents of Telephone #1. On the same day, NHSP Detective Tyler Brennan conducted the forensic extraction of Telephone #1 and provided the ATF with a copy of the extraction.

*Voluntary Extraction of Telephone #2*

23.      On or about September 12, 2023, BIMPSON was arrested by NHSP in Gorham, New Hampshire for outstanding warrants. During the arrest operation, Source #2 provided information to NHSP relative to BIMPSON and his possession and distribution of firearms and drugs. Source #2 voluntarily provided information, did not request, nor receive a monetary reward, and did not receive favorable consideration for criminal cases. Source #2 stated they knew BIMPSON for approximately a few years and were a former associate of BIMPSON's DTO. Source #2's motivation for providing information was due to protect the community, to include community members close to Source #2.

24.      Source #2 stated BIMPSON utilized his marijuana business in Maine to facilitate the illegal trade of guns and drugs in New Hampshire and Maine. Source #2 stated BIMPSON received firearms from a source in Littleton, New Hampshire. Source #2 showed corroborating videos, photographs, and/or messages on their cellphone ("Telephone #2"), which were received from BIMPSON's known cellphone number, 207-804-0872, and/or his known social media accounts, such as Facebook account #522139785940237 with the vanity name "Filipe Xlii."

25.      On or about September 12, 2023, Source #2 voluntarily provided Telephone #2 to NHSP Troop F Detectives to have the contents extracted. Source #2 provided consent for law

enforcement agencies to review the contents of Telephone #2. On the same day, NHSP Detective

Tyler Brennan conducted the forensic extraction of Telephone #2.

<u>*BIMPSON – History of Drugs and Firearms*</u>

26.     I know through reviewing police reports, speaking with involved officers,

reviewing BIMPSON's social media accounts to include Instagram and Facebook, and reviewing

the content of Telephone #1 and Telephone #2, that BIMPSON has regularly consumed and/or

distributed marijuana, cocaine, and other drugs, such as suspected methamphetamine, ecstasy

and/or 3,4-Methylenedioxymethamphetamine ("MDMA") , and hallucinogens, to include

Lyesrgic acid diethylamide ( "LSD") and Psylocibin mushrooms, and has also been involved in

the illegal possession and trafficking of firearms.

27.     I am familiar with and able to identify BIMPSON in photographs and videos after

conferring with law enforcement personnel who have had professional involvement with

BIMPSON, and after viewing hundreds of photographs and/or videos to include multiple social

media accounts belonging to BIMPSON and/or associates, booking photographs, and

photographs from the contents of Telephone #1. I am familiar with the numerous different

appearances of BIMPSON to include varying hair lengths and styles, facial hair, and other

accessories to include clothing, hats, and face coverings.

28.     I reviewed Northborough, Massachusetts Police ("NPD") Report # 1900021351,

dated December 10, 2019, in which NPD contacted a motor vehicle in which BIMPSON was

identified as the operator. NPD officers observed what appeared to be a firearm in direct control

of the female rear passenger, later identified as Hailey BROWN, the mother of BIMPSON's

child. BIMPSON admitted during the incident that he was driving the front passenger, Brandon

LANZOFANO, a convicted felon from New Haven, Connecticut, from Maine to Connecticut. A

8

pat frisk of the vehicle revealed the suspected firearm was a BB gun. A pat frisk of a bag claimed by LANZOFANO to be his, yielded a Glock, model 22, .40 S&W caliber pistol, bearing serial number KYZ852 in the case with two 15 round magazines and no ammunition. BROWN stated she had purchased the firearm a day or two prior in Maine. BROWN later plead guilty to the possession of a firearm without a license and improper storage of a firearm. BIMPSON was also arrested for motor vehicle infractions. During the booking process, BIMPSON provided the cellphone number 207-595-2356.

29.     Based on my training and experience, firearms recovered in the possession of prohibited persons, who are in and/or from a different state in which the firearm was purchased is indicative of firearms trafficking. I know that the facts of the December 10, 2019 event, such as the original purchaser, BROWN, who purchased the firearm just a few days prior, and had relinquished possession of the firearm to a prohibited person from a different state, LANZFANO, is consistent with a straw purchase and/or firearms trafficking. I know that both BIMPSON and LANZOFANO were prohibited persons at the time of the incident and were not able to purchase or possess firearms themselves. I know that BROWN had no prior criminal history at the time of the event.

### *BIMPSON Instagram Accounts - @xliifilipe & @mack_lavoie*

30.     On September 7, 2023, I reviewed the public postings of the Instagram account of BIMPSON, under the username "@xliifilipe." I know through a recorded, Mirandized interview of BIMPSON on September 12, 2023, by NHSP that BIMPSON admitted to owning and posting to this account. I knew from Source #1 that "XLII" was the roman numeral for the number 42, which is BIMPSON's favorite number, tattooed on his person, and is part of his persona and personal "brand." I observed the following public posts to include:



a.  Posted November 2, 2020 – A video posted to @xliifilipe, depicted a male,

    suspected to be BIMPSON, holding what appeared to be a semiautomatic

    shotgun. In the video, the male, racked the shotgun, to enable it to fire and fired

    the shotgun four (4) times into the ground. The caption of the video read "Let this

    mf EAT." I know through my training, knowledge, and experience that the

    caption is in reference to shooting the firearm. I know the term "eat" to be in

    reference to a firearm being fired and "consuming" ammunition;

10



b.  Posted November 2, 2020 – A photograph posted to @xliifilipe, depicted a suspected AK-type firearm of unknown make, model or caliber, with a distinct painted wood foregrip, a detached vertical foregrip, a screwdriver, and an extended magazine inserted into the firearm. I know through my training, knowledge, and experience that the screwdriver and unattached foregrip depicted in the photograph are indicative of a person modifying a firearm by adding or removing accessories to the firearm.

c.  I know through my training, knowledge, and experience that persons often utilize their cellphones to document photographs and videos, and the originals are then retained on the device, which may be later uploaded to social media accounts. I know that through cloud-based servers these photographs and videos may be carried over to new devices obtained by the owner. I know that photographs and videos saved to a person's cellphone may provide evidence as to when the video or photograph posted to social media was actually taken. During the time the

11

above photographs were posted to social media, BIMPSON was prohibited from

possessing firearms.



d.  Posted November 2, 2020 – Videos and photographs posted to @xliifilipe,

depicted a series of posts related to controlled substances derived from marijuana,

such as butane hash oils ("BHO"), commonly referred to as "dabs," which contain

high concentrations of Delta-9-tetrahydrocannabinol ("THC"), the psychoactive

chemical in marijuana. The posts depict a large sheet pan of a yellow substance,

which I know through my training, knowledge, and experience, as well as

concurring with drug investigators familiar with this case, that the substance is

consistent with BHO and is of distribution quantities. Further, the photographs

depicting glass containers are consistent with how BHO's are packaged and

distributed. One photograph depicted BIMPSON, MILLER—who I recognized

through booking photos, driver's license photos and social media posts—and a

third male, suspected to be Cole DRAPER, a former interested party of M3

Cannabis Corp, each holding up large quantities of raw marijuana, consistent with

distribution quantities.

31.     On September 17, 2023, I reviewed the public postings of the Instagram account

of BIMPSON, under the username "@mack_lavoie." I know through Berlin Police Report #20-

229-OF, dated April 24, 2020, that BIMPSON has utilized the alias "Mackenzie Lavoie." I

observed Berlin Police Lieutenant Nathan Roy wrote in his report that during the incident,

BIMPSON showed Lieutenant Roy a social media account in the name "Mack Lavoie" which

depicted BIMPSON in the profile picture. I learned from Source #1 and Telephone #1 that

BIMPSON's primary email address was mackenzielavoie04@gmail.com. I observed the

following public posts by @mack_lavoie to include:



a.   Posted November 14, 2019 – a video posted to @mack_lavoie, depicting a male,

suspected to be BIMPSON, holding a black suspected compact pistol, similar to a

Ruger, model LCP compact pistol. The male was also holding a wad of U.S.

currency, and a magazine loaded with what appeared to be ball ammunition.



14

b. Posted May 5, 2020 – a video posted to @mack_lavoie, depicting BIMPSON holding a black suspected Glock pistol, which I was able to identify through my training, knowledge, and experience to include formerly being certified as a Glock Armorer, and my utilizing and manipulating a Glock pistol as a government issued duty weapon approximately daily since 2012. The caption of the video stated, "Thought you werent supposed to be around firearms."



15



c.  Posted May 9, 2020 – a video posted to @mack_lavoie, depicting a large sum of
US currency in all $20 USD bills. On the same day, a photograph was also posted
to @mack_lavoie, depicting what appeared to be BHO with a caption on the
picture that said "Hmu whenever." I know this to mean "Hit me up whenever," in
reference to BIMPSON actively utilizing social media to sell BHOs. I know that
posting illicit drugs, such as BHOs and large sums of cash on the same date is
indicative of drug distribution.

### *BIMPSON Facebook Accounts – Filipe Xlii & Mack Lavoie*

32.     On September 7, 2023, I reviewed the public postings of the Facebook account of
BIMPSON, under the username "Filipe Xlii." I learned from debriefs of Source #1 and Source
#2 that Filipe Xlii is BIMPSON's primary means of communication via cellphones via the Meta
Messenger application. I observed the following public posts to include:

16



33.     Posted October 3, 2021 – A picture posted to @xliifilipe, depicted BIMPSON utilizing a cellphone in a black case. BIMPSON commented on the photograph stating "…you know its always on go." During the September 12, 2023, recorded, Mirandized interview of BIMPSON on numerous occasions he stated in substance that his entire life and work was located on his phone.



34.     Posted October 14, 2022 – A picture posted to @xliifilipe, depicted a cartoon

17

skeleton, wearing a hat with a marijuana leaf and the name "Mack" an alias used by BIMPSON; a bandana around its neck with "M3" written on it, the company owned by BIMPSON; holding two revolvers, cash and marijuana plants in the background.



35.     Posted January 17, 2022 – A picture posted to @xliifilipe, depicted BIMPSON holding a large stack of US currency. I know from observing BIMPSON's multiple social media accounts that BIMPSON consistently posts photos or videos of large quantities of cash, despite having no other legitimately employment other than being a registered Maine Marijuana caregiver. Through basic research as well as speaking with law enforcement personnel familiar with outdoor marijuana cultivation, I know that harvest season for outdoor marijuana grow operations is typically during the month of October and the opportunity to make money is much more restricted than that of an indoor grow operation. The consistent posting of large sums of cash is indicative that BIMPSON has an additional cash-only business, such as dealing drugs and firearms.

18



36.     Posted March 31, 2022 – A picture posted to @xliifilipe, depicted what appeared to be a round of shotgun ammunition, resting on top of a tobacco leaf, commonly referred to as a "blunt wrap" and a green leafy substance, which through my training, knowledge, and experience, appeared to be marijuana. I know through Telephone #1, that the date, March 31, 2022, is significant to shotguns, as Source #1 filmed a Facetime with BIMPSON in which he was holding a magazine fed, black, AR-12-type shotgun.

37.     On September 17, 2023, I reviewed the public postings of the Facebook account of BIMPSON, under the username "Mack Lavoie." I know through Berlin Police Report #20-229-OF, dated April 24, 2020, that BIMPSON has utilized the alias "Mackenzie Lavoie." I observed Berlin Police Lieutenant Nathan Roy wrote in his report that during the incident, BIMPSON showed Lieutenant Roy a social media account in the name "Mack Lavoie" which depicted BIMPSON in the profile picture. I learned from Source #1 and Telephone #1 that

19

BIMPSON's primary email address was <u>mackenzielavoie04@gmail.com</u>. I observed the following public posts to include:



a. Posted February 6, 2020 – a series of photographs posted to the "Mack Lavoie" account, depicted mainstream clothing and a pistol with the caption "Me this summer." I know that BIMPSON was prohibited from possessing firearms at the time of this post.

*BIMPSON to Source #1 Conversations – Telephone #1*

35.    On or about August 30, 2023, I reviewed six (6) videos provided by Source #1, all dated August 29, 2023, due to being downloaded and/or screenshots, of prior messages sent from BIMPSON via the Messenger app, and received via Telephone #1 by Source #1. Upon further examination of Telephone #1, I learned most of the original and/or modification dates in which BIMPSON provided Source #1 the videos. I observed the context of some videos from text messages between BIMPSON's known phone numbers and Telephone #1. I observed that BIMPSON utilized registered Verizon Wireless phone number 207-595-2356 between March 27, 2020, and December 18, 2022, to contact Telephone #1. I observed that BIMPSON utilized registered Verizon Wireless phone number 207-804-0872 between June 27, 2022, and August 5, 2023, to contact Telephone #1.



36.     The video depicted BIMPSON, as identified by Source #1, due to his wristwatch, as seen in other videos, clothing and blue bankers' bag, which according to Source #1, he commonly carries cash in. In the video, BIMPSON is holding a German Sports Gun, model GSG-1911, .22 LR HV caliber pistol, bearing serial number A951448. On September 1, 2023, I learned through a trace of the firearm, that it was purchased by a Merek WEISENSEE, a individual known to the ATF and who commonly sold firearms via the secondhand market, such as Armslist or through social media.  WEISENSEE purchased this firearm on February 21, 2023, from Fieldmaster Firearms, LLC in Belmont, New Hampshire. According to Source #1, this firearm was acquired by BIMPSON from LAPLANTE in Littleton, New Hampshire and later sold to Jason WHITNEY in Groveton, New Hampshire approximately five (5) months prior, around April 2023.



37.     A video sent by BIMPSON on or about June 22, 2023, depicted BIMPSON holding a Springfield, model Hellcat, 9x19mm pistol with a red dot sight and a loaded magazine containing a round of an unknown brand of ammunition, suspected to be a 9x19mm round of ammunition. According to Source #1 and as observed in Telephone #1, on that date, BIMPSON and Source #1 went to 655 Hilltop Road, in Littleton for BIMPSON to receive the Hellcat pistol from LAPLANTE and fire it in LAPLANTE's backyard.



38.     In the same conversation, on the June 22, 2023, I observed BIMPSON send a photograph to Telephone #1, which depicted BIMPSON, readily identified by his *Rick and Morty* tattoo on his wrist, holding what appeared to be a black unmarked silencer with a Ziploc bag containing small cylindrical metallic pieces, consistent with the baffles of a privately made firearm ("PMF") silencer. I observed the suspected baffles to have awl marks in the center of each piece, which are commonly used to guide a drill bit of whatever caliber the manufacturer of the PMF determines.

39.     In my experience, I have seized dozens of non-drilled, unfinished silencers, which the ATF Firearms and Ammunition Technology Division has classified as firearms, due to being readily converted into a functioning firearm under the National Firearms Act ("NFA"), 26 U.S.C. §§5801-5872. Source #1 stated the two (2) other pair of shoes observed in the photograph were those of Source #1 and of LAPLANTE. According to Source #1, LAPLANTE made "homemade" silencers, which are classified by the ATF as PMF silencers and which would be attached to firearms BIMPSON sold on behalf of LAPLANTE. I observed messages from BIMPSON to Telephone #1 on June 22, 2023, regarding "Chucky" having a surprise for BIMPSON. BIMPSON believed the surprise would be "my Hellcat."

40.     I know through my training, knowledge and experience that silencers are NFA firearms and therefore have to be registered to the National Firearms Registration and Transfer Record ("NFRTR"). I know that silencers are used to muffle the sound produced by the action of a firearm. I know that criminals utilize silencers to conceal their use of firearms in the commission of crimes. I know that firearms without serial numbers, such as PMFs, if they are within the definition and regulation of NFA firearms, such as silencers, cannot be registered to

the NFRTR, due to a lack of a serial number, and therefore are inherently illegal and cannot be possessed by anyone.



41.     A video sent by BIMPSON on or about August 9, 2023, depicted ten (10) unmarked receiver sets, which appeared to have been partially completed, and therefore would be considered firearms. According to Source #1, the video was filmed in LAPLANTE's garage at 655 Hilltop Road, Littleton, New Hampshire. I observed one of the lower receivers to be non-anodized metal, which is consistent with being manufactured as a PMF (also referred to as a "ghost gun."). I also observed a lower receiver in a metal guide, commonly referred to as a "jig." I know raw non-anodized metal and jigs are consistent with the manufacturing of PMF firearms from raw materials and or aluminum molds, referred to by the firearms industry as "80% receivers." I know that all ten receiver sets in the video are all consistent with PMF firearms, as there are no markings or legible serial numbers. That LAPLANTE was manufacturing firearms in his garage as depicted in the video of multiple partially completed PMF receiver sets is consistent with the statements made by Source #1 to investigators.

42.     I know through my knowledge, training, and experience that PMFs are firearms manufactured by non-licensed manufacturers, such as a private citizen. I know that PMFs were designed to be manufactured for individual purchase and manufacturing, such as "build-your-own" kits, for firearms enthusiasts. I know that these aforementioned kits can be purchased online and shipped right to an individual's residence and are not required to have a background check conducted, such as when an individual purchases a firearm from a Federal Firearms Licensee ("FFL"). I know that the aforementioned kits are designed to be completed to manufacture a firearm, as defined by Title 18 U.S.C. §921(a)(3). I know that PMFs are not required to be serialized by the non-licensed manufacturer. I know that selling PMFs cannot be done to earn a profit and/or engaging in the firearms license business.

43.     I know that criminals utilize PMFs to conduct criminal activity because PMFs can be bought, shipped, and manufactured at a person's residence, concealed from law enforcement. PMFs do not require a background check and can be easily obtained by prohibited persons. PMFs, due to not being serialized, cannot easily be traced like traditional commercially manufactured firearms, and therefore are easily concealed from law enforcement investigations.



44.     A video sent by BIMPSON on or about March 31, 2022, depicts BIMPSON, identified by his outfit, observed in numerous other videos, as well as by Source #1, holding an AR-type pistol, bearing no identifiable marks. Source #1 stated the video was taken from the inside of LAPLANTE's garage at 655 Hilltop Road, Littleton, New Hampshire. Source #1 indicated that BIMPSON had been receiving firearms from LAPLANTE for at least eighteen months, if not longer. The receiver of the AR-type pistol is consistent with the video of the ten (10) receiver sets sent by BIMPSON as recent as August 9, 2023. I know that people illegally manufacturing PMFs often utilize the same brands and companies due to limiting the kind of jigs and other tools needed to complete the firearm. In order to efficiently and cost-effectively make a large sum of PMFs, it would be most efficient to utilize the same brand and to buy material in bulk.

*BIMPSON to Source #2 Conversations – Telephone #2*

45.     I observed two specific videos on both Telephone #1 and Telephone #2 that were received from BIMPSON via the Messenger App:

46.     August 9, 2023 – the video depicting the ten (10) PMF unmarked receiver sets, taken inside LAPLANTE's garage at 655 Hilltop Road, Littleton, New Hampshire, as described in Paragraph 41.



47.     July 6, 2023 – Depicting BIMPSON, readily identified by his forearm tattoo, inside of a Scion vehicle, holding a Geisler Defence, model 1917, 9x19mm pistol, bearing no visible serial number, with distinct aftermarket accessories and modifications to include: an American flag slide; a gold barrel with "Join or Die" written on it with the rattlesnake in eight (8) pieces, commonly referred to as the "Join or Die" flag, symbolic of the Second Amendment and right to bear arms; a pistol light and laser; a custom trigger with a gold trigger safety; gold

extractor; gold slide cover plate; gold frame pins; and an extended magazine with a clear window containing an undetermined amount of ammunition.

48.     I observed LAPLANTE's Facebook profile to show a firearm with the same exact modifications, posted to his page on July 4, 2023, two days prior to BIMPSON's post.





49.     I observed BIMPSON comment 10 weeks prior "Mmmmm I cannot wait to see that thing EATT." I know BIMPSON to use this terminology in a prior social media post in reference to shooting the firearm and "consuming" ammunition.

30

50.     According to Source #1, the carpet depicted in LAPLANTE's photograph on his Facebook page is located in the garage at 655 Hilltop Road, Littleton, New Hampshire and can be observed in other videos and photographs sent by BIMPSON of firearms.

51.     According to Source #1, the video dated July 6, 2023, was inside of LAPLANTE's boxy vehicle. According to Source #2, LAPLANTE's vehicle is a box-style small SUV like the one with "hamsters in the commercials." I learned through a search of registered vehicles to LAPLANTE, that he is the active registered owner of a 2008 white Scion xB, bearing New Hampshire registration 5158661 (VIN: JTLKE50E681058921), which was registered on August 25, 2022.

52.     I observed additional videos of BIMPSON, identified by his voice and tattoos, inside of a vehicle with a similar dashboard and distinct round air vents and could observe the steering wheel to show the Scion logo. In one of the videos (unknown date), BIMPSON narrated he was "sitting here at the apartments in Whitefield…Chucky had to go, stop here…he's [Chucky] been in there for ten fucking minutes." I know that LAPLANTE's nickname is "Chucky."



53.     I know through my training, knowledge and experience that the firearm depicted as discussed above, Giesler Defence, model 1917 pistols are made as PMF kits, to be completed by the purchaser and originally manufactured in Israel. I know that Giesler Defence only makes PMFs and does not make completed firearms that are imported into the United States. I know that this is consistent with Source #1 and Source #2's statements that LAPLANTE makes "ghost guns" (or PMFs), which BIMPSON then sells.

*BIMPSON Messages - Drugs*

54.     I observed numerous photographs on Telephone #1 and Telephone #2 that depicted suspected drugs in distribution quantities as well as cash. I observed large quantities (multiple pounds) of marijuana, as well as white powder substances, consistent with cocaine and dark rock-like substances, suspected to be methamphetamine. Source #1 and Source #2 both confirmed that BIMPSON and MILLER had a suspected cocaine connection in Connecticut,

32

supplying a "brick," known for slang for one kilogram, as well as BIMPSON being arrested on December 10, 2019, while enroute to Connecticut with a firearm in the car and LANZOFANO as a front passenger.





55.     I know through my training knowledge, and experience that firearms are often traded for drugs. I know that New Hampshire and Maine are often considered source states for firearms, due to less stringent purchasing requirements. I therefore know that firearms purchased in New Hampshire and Maine are often trafficked south to states with more stringent laws, such as Massachusetts, Connecticut, and New York. As a result, I know that it is not uncommon for firearms accompanied by little to no illegal drugs to be interdicted going southbound while drugs are regularly interdicted going northbound.

## TECHNICAL TERMS

56.     Based on my training and experience, I use the following technical terms to convey the following meanings:

      a.   Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also

include global positioning system ("GPS") technology for determining the location of the device.

b.  Digital camera:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media include various types of flash memory cards or miniature hard drives.  Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c.  Portable media player:  A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.  However, a portable media player can also store other digital data.  Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can also store any digital data.  Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.  GPS:  A GPS navigation device uses the Global Positioning System to display its current location.  It often contains records the locations where it has been.  Some GPS navigation devices can give a user driving or walking directions to another

35

location.  These devices can contain records of the addresses or locations involved

in such navigation.  The Global Positioning System (generally abbreviated

"GPS") consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite

contains an extremely accurate clock.  Each satellite repeatedly transmits by radio

a mathematical representation of the current time, combined with a special

sequence of numbers.  These signals are sent by radio, using specifications that

are publicly available.  A GPS antenna on Earth can receive those signals.  When

a GPS antenna receives signals from at least four satellites, a computer connected

to that antenna can mathematically calculate the antenna's latitude, longitude, and

sometimes altitude with a high level of precision.

e.  PDA:  A personal digital assistant, or PDA, is a handheld electronic device used

for storing data (such as names, addresses, appointments or notes) and utilizing

computer programs.  Some PDAs also function as wireless communication

devices and are used to access the Internet and send and receive e-mail.  PDAs

usually include a memory card or other removable storage media for storing data

and a keyboard and/or touch screen for entering data.  Removable storage media

include various types of flash memory cards or miniature hard drives.  This

removable storage media can store any digital data.  Most PDAs run computer

software, giving them many of the same capabilities as personal computers.  For

example, PDA users can work with word-processing documents, spreadsheets,

and presentations.  PDAs may also include global positioning system ("GPS")

technology for determining the location of the device.

36

f.  Tablet:  A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen.  Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise.  Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions.  Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

g.  Pager:  A pager is a handheld wireless electronic device used to contact an individual through an alert, or a numeric or text message sent over a telecommunications network.  Some pagers enable the user to send, as well as receive, text messages.

h.  IP Address: An Internet Protocol address ("IP address") is a unique numeric address used by computers on the Internet.  An IP address is a series of four numbers, each in the range 0-255, separated by periods (*e.g.*, 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

i.  Internet: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet,

37

connections between devices on the Internet often cross state and international

borders, even when the devices communicating with each other are in the same

state.

57.     Based on my training, experience, and research, I know that the Device has

capabilities that allow it to serve as a wireless telephone, digital camera, portable media player,

GPS navigation device, and PDA.  In my training and experience, examining data stored on

devices of this type can uncover, among other things, evidence that reveals or suggests who

possessed or used the device.

58.     Based on my training and experience, I know that drug traffickers typically use

cellular telephones in order to facilitate drug transactions, including to order and take orders for

controlled substances or to set up shipments. I am aware that items such as cell phones and U.S.

currency are often located in a residence or on an individual's person. I am also aware that drug

trafficker may use computers to facilitate drug transactions much in the same way they would

use a cellular telephone.  In addition, I am aware that drug traffickers may order and

communicate with their sources of supply via computer.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

59.     Based on my knowledge, training, and experience, I know that electronic devices

can store information for long periods of time.  Similarly, things that have been viewed via the

Internet are typically stored for some period of time on the device.  This information can

sometimes be recovered with forensics tools.

60.     There is probable cause to believe that things that were once stored on the Device

may still be stored there, for at least the following reasons:

j.  Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

k.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

l.  Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

39

  m. Similarly, files that have been viewed via the Internet are sometimes

    automatically downloaded into a temporary Internet directory or "cache."

61. *Forensic evidence.* As further described in Attachment B, this application seeks

permission to locate not only electronically stored information that might serve as direct

evidence of the crimes described on the warrant, but also forensic evidence that establishes how

each Device was used, the purpose of its use, who used it, and when. There is probable cause to

believe that this forensic electronic evidence might be on the Device because:

  n. Data on the storage medium can provide evidence of a file that was once on the

    storage medium but has since been deleted or edited, or of a deleted portion of a

    file (such as a paragraph that has been deleted from a word processing file).

    Virtual memory paging systems can leave traces of information on the storage

    medium that show what tasks and processes were recently active. Web browsers,

    e-mail programs, and chat programs store configuration information on the

    storage medium that can reveal information such as online nicknames and

    passwords. Operating systems can record additional information, such as the

    attachment of peripherals, the attachment of USB flash storage devices or other

    external storage media, and the times the computer was in use. Computer file

    systems can record information about the dates files were created and the

    sequence in which they were created.

  o. Forensic evidence on a device can also indicate who has used or controlled the

    device. This "user attribution" evidence is analogous to the search for "indicia of

    occupancy" while executing a search warrant at a residence.

p.  A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

q.  The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

r.  Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

s.   I know that when an individual uses an electronic device to obtain drugs or firearms, the individual's electronic device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime.  The electronic device is an instrumentality of the crime because it is used as a means of committing the criminal offense.  The electronic device is also likely to be a storage medium for evidence of crime.  From my training and experience, I believe that an electronic device used to commit a crime of this type may contain: data that is evidence of how the electronic device was

41

used; data that was sent or received; and other records that indicate the nature of the offense.

62.     *Nature of examination.*   Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

63.     *Manner of execution.*   Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

64.     Based on the foregoing, there is probable cause to believe that the Device, described more fully in Attachment A, contains items described in Attachment B that constitute evidence, fruits, or instrumentalities of violations of 18 U.S.C. § 933 (firearms trafficking), 18 U.S.C. § 922(g)(1) (unlawful possession of firearms), 18 U.S.C. § 922(g)(3) (unlawful possession of firearms), 18 U.S.C. § 922(g)(9) (unlawful possession of firearms),  21 U.S.C. 841(a)(1) (distribution and possession with intent to distribute controlled substances), and 26 U.S.C. § 5681(d) (unlawful possession of unregistered NFA firearms).  Accordingly, I respectfully request that this Court issue a search warrant authorizing the examination of the Device described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

/s/ Patrick Dawley
Patrick Dawley
Special Agent
Bureau of Alcohol, Tobacco, Firearms,
And Explosives

Subscribed and sworn to before me telephonically on September 27, 2023:

UNITED STATES MAGISTRATE JUDGE

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means          ☐ Original          ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
### for the
### District of New Hampshire

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No.  1:23-mj- |
| information associated with Facebook account numbers 522139785940237, 100079155496337, 6572981706055516, and 100069665209156 held at premises controlled by Meta Platforms, Inc. | ) ) ) ) | |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

     An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____Northern_____ District of _____California_____
*(identify the person or describe the property to be searched and give its location)*:

Please see attachment A.

     I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

Please see attachment B.

     **YOU ARE COMMANDED** to execute this warrant on or before _____October 27, 2023_____ *(not to exceed 14 days)*
  ☑ in the daytime 6:00 a.m. to 10:00 p.m.   ☐ at any time in the day or night because good cause has been established.

     Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

     The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____Hon. Talesha L. Saint-Marc_____ .
                                          *(United States Magistrate Judge)*

     ☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
     ☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:      **3:59 PM, Oct 13, 2023**
                                                                  *Judge's signature*

City and state:   Concord, New Hampshire
                                          Hon. Talesha L. Saint-Marc, U.S. Magistrate Judge
                                                    *Printed name and title*

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br>    1:23-mj- | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

| **Certification** |
|---|
|           I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.<br><br><br><br>Date:  _____                     _____<br>                                                                                                                *Executing officer's signature*<br><br>                                                                                 _____<br>                                                                                                                      *Printed name and title* |

**<u>ATTACHMENT A</u>**

**Property to Be Searched**

This warrant applies to information associated with the following Facebook accounts, that are stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc., a company headquartered in Menlo Park, California:

1. Facebook account #522139785940237 ("Felipe Xlii" /melvin.slime.7 – Mackenzie BIMPSON)

2. Facebook account #100079155496337 ("Goldo Piketu" – Steve PEREZ)

3. Facebook account #6572981706055516 (E. Charles LAPLANTE)

4. Facebook account #100069665209156 (Michael MILLER)

**ATTACHMENT B**

**Particular Things to be Seized**

I.      **Information to be disclosed by Meta Platforms, Inc. ("Meta")**

To the extent that the information described in Attachment A is within the possession, custody, or control of Meta, regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Meta, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Meta is required to disclose the following information to the government for each user ID listed in Attachment A:

(a)     All contact and personal identifying information, including full name, user identification number, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers;

(b)     All activity logs for the account and all other documents showing the user's posts and other Facebook activities from October 8, 2021, to October 10, 2023;

(c)     All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them October 8, 2021, to October 10, 2023, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

(d)     All profile information; News Feed information; status updates; videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification

numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(e)     All records or other information regarding the devices and internet browsers associated with, or used in connection with, that user ID, including the hardware model, operating system version, unique device identifiers, mobile network information, advertising ID, and user agent string;

(f)     All other records and contents of communications and messages made or received by the user October 8, 2021, to October 10, 2023, including all Messenger activity, private messages, chat history, video and voice calling history, and pending "Friend" requests;

(g)     All "check ins" and other location information;

(h)     All IP logs, including all records of the IP addresses that logged into the account;

(i)     All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

(j)     All information about the Facebook pages that the account is or was a "fan" of;

(k)     All past and present lists of friends created by the account;

(l)     All records of Facebook searches performed by the account October 8, 2021, to October 10, 2023;

(m)     All information about the user's access and use of Facebook Marketplace;

(n)     The types of service utilized by the user;

(o)     The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(p)     All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

(q)     Records of any Facebook accounts that are linked to the account by machine cookies (meaning all Facebook user IDs that logged into Facebook by the same machine as the account); and

(r)     All records pertaining to communications between Meta and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

Meta is hereby ordered to disclose the above information to the government within 14 days of issuance of this warrant.

**II.      Information to be seized by the government**

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of 18 U.S.C. § 933 (firearms trafficking), 18 U.S.C. § 922(g)(1) (the unlawful possession of firearms), 18 U.S.C. § 922(g)(3) (the unlawful possession of firearms), 18 U.S.C. § 922(g)(9) (the unlawful possession of firearms),  21 U.S.C. 841(a)(1) (distribution and possession with intent to distribute controlled substances) and 26 U.S.C. § 5681(d) (the unlawful possession of unregistered NFA firearms) involving Mackenzie BIMPSON, Michael MILLER, E. Charles LAPLANTE, Steve PEREZ and other unnamed or unidentified persons since October 8, 2021, including, for each user ID identified on Attachment A, information pertaining to the following matters:

(a)     The illegal manufacturing, procurement, purchase, possession, disposition and/or transfer of firearms and drugs. Any communications between BIMPSON, MILLER, LAPLANTE, and PEREZ in furtherance of firearms and drug trafficking.

(b)     Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

(c)     Evidence indicating the Facebook account owner's state of mind as it relates to the crime under investigation;

(d)     The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

# ATTACHMENT C

### AFFIDAVIT IN SUPPORT OF AN APPLICATION
### <u>UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE</u>

I, Patrick Dawley, a Special Agent with the Department of Alcohol, Tobacco, Firearms, and

Explosives ("ATF") being first duly sworn, hereby depose and state as follows:

### <u>INTRODUCTION AND AGENT BACKGROUND</u>

1.       I am a Special Agent with the United States Department of Justice, Bureau of

Alcohol, Tobacco, Firearms, and Explosives ("ATF"), and have been since February of 2019.  I

am currently assigned to the Manchester, New Hampshire Field Office in the Boston Field

Division.  While training to become a Special Agent, I attended the Federal Law Enforcement

Training Center ("FLETC") in Glynco, GA full-time for six-and-a-half months. During my time

at FLETC, I received training in practices and methods of illegal firearm possessors, firearm

traffickers, and related federal criminal statutes. Prior to becoming an ATF Special Agent, I was

a Police Officer for the Reading, Massachusetts Police Department for approximately seven

years.  As a Special Agent and Police Officer I have conducted and/or participated in a number

of investigations involving state and federal firearm and controlled substance violations.  I have

interviewed multiple victims, sources of information, witnesses, suspects, and defendants

regarding various types of criminal activity.  I have also served search warrants for various

crimes and have made criminal arrests for firearm and controlled substance violations. I

participated in state and federal investigations involving possession of illegal weapons including

firearms, improvised explosive devices, and possession of controlled substances.  I also

conducted numerous investigative stops and probable cause searches of people and vehicles.  I

participated in physical surveillance operations and participated in the execution of state and

federal arrest warrants.

2.      This affidavit is intended to show only that there is sufficient probable cause for
the requested warrant and does not set forth all of my knowledge about this matter.

## PURPOSE OF AFFIDAVIT

3.      I make this affidavit in support of an application under Rule 41 of the Federal
Rules of Criminal Procedure for a search warrant authorizing the examination of property— an
electronic device as more fully described in Attachment A—which are currently in law
enforcement possession, and the extraction from that property of electronically stored
information described in Attachment B.

4.      Based on my training and experience, I submit that the facts contained in this
affidavit establish probable cause to believe the Mackenzie BIMPSON ("BIMPSON"), and other
known and unknown to the Government have committed violations of 18 U.S.C. § 933 (firearms
trafficking), 18 U.S.C. § 922(g)(1) (unlawful possession of firearms), 18 U.S.C. § 922(g)(3)
(unlawful possession of firearms), 18 U.S.C. § 922(g)(9) (unlawful possession of firearms),  21
U.S.C. 841(a)(1) (distribution and possession with intent to distribute controlled substances), and
26 U.S.C. § 5681(d) (unlawful possession of unregistered NFA firearms), and that evidence,
fruits, and instrumentalities of these offenses, as well as evidence of the identify of any co-
conspirator(s) will be found on the subject electronic device, as further described in Attachment
B.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

5.      The property to be searched is an Apple iPhone (unknown model) smartphone
("Device").

6.      The Device is currently in the lawful possession of the New Hampshire State
Police ("NHSP").  The Device came into the NHSP's possession in the following way: on

2

September 12, 2023, NHSP arrested BIMPSON for outstanding State of New Hampshire electronic bench warrants for unsworn falsification and possession of marijuana and/or hash. During the search incident to arrest, the Device was located within the direct control of BIMPSON, was later identified as his cellphone per BIMPSON's admission during a Mirandized interview, and was seized pending a State search warrant related to an ongoing investigation into a criminal threatening incident that had transpired a few days prior, on September 9, 2023.

7.     The Device is currently in storage at the evidence locker at NHSP Troop F in Twin Mountain, New Hampshire.  In my training and experience, I know that the Device has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the Device first came into the possession of a law enforcement agency, to include NHSP.

8.     The applied-for warrant would authorize the forensic examination of the Device in NHSP custody and any forensic data extractions of its electronically stored data as described more particularly in Attachment B.

**PROBABLE CAUSE**

9.     Along with other members of law enforcement, I am conducting an investigation of BIMPSON for violations of 18 U.S.C. § 933 (firearms trafficking), 18 U.S.C. § 922(g)(1) (unlawful possession of firearms), 18 U.S.C. § 922(g)(3) (unlawful possession of firearms), 18 U.S.C. § 922(g)(9) (unlawful possession of firearms),  21 U.S.C. 841(a)(1) (distribution and possession with intent to distribute controlled substances), and 26 U.S.C. § 5681(d) (unlawful possession of unregistered NFA firearms).

*Background*

10.     On August 30, 2023, ATF received a request for assistance from numerous

agencies related to BIMPSON and suspected firearms trafficking. BIMPSON is well known to

NHSP due to his extensive amount of law enforcement interactions, as well as numerous law

enforcement agencies in Northern New Hampshire (Grafton and Coos County) and Western

Maine (Androscoggin, Cumberland, and Oxford County).  BIMPSON's past contact with law

enforcement is generally related to drug distribution and suspected firearms possession and

trafficking.

11.     I learned from NHSP Sergeant Detective Sean Smarz, that on or about August 25,

2023, a source of information ("Source #1") contacted NHSP to provide information related to

extensive firearms and drug trafficking in Northern New Hampshire and Western Maine. Source

#1 voluntarily provided information, did not request, nor receive a monetary reward, and did not

receive favorable consideration for criminal cases. According to Source #1, their motivation in

providing information was for the betterment of society and disruption to criminal activity in the

community. Source #1 has known BIMPSON since approximately 2012 and was a former

associate of BIMPSON's drug trafficking organization ("DTO").

12.     I learned from Littleton Police Detective Bryce Lineman, that on or about August

29, 2023, Source #1 met with investigators of the New Hampshire Attorney General's Drug Task

Force ("NHAGDTF") and NHSP, to provide further detailed information related to drug

trafficking.

13.     On September 7, 2023, I conducted a telephonic debrief with Source #1 along

with NHSP Troop F Detectives and investigators with the NHAGDTF, to obtain further detailed

information related to firearms trafficking.

4

14.     During the debriefs, Source #1 provided consistent and credible accounts that BIMPSON was the leader of a DTO which primarily operated in Northern New Hampshire and Western Maine.  According to Source #1, BIMPSON and others in the DTO obtained firearms in Littleton, New Hampshire and disposed of the firearms in the Connecticut area to prohibited persons, such as drug dealers, drug users and known criminals, in exchange for distribution quantities of powdered cocaine. Source #1 also stated that BIMPSON disposed of firearms in Western Maine in exchange for drugs, to include marijuana.

15.     In both instances, BIMPSON then sold exchanged-for drugs and utilized the ill-gotten gains to fund firearms manufacturing by E. Charles "Chucky" LAPLANTE ("LAPLANTE") at his residence at 655 Hilltop Road, Littleton, New Hampshire. Source #1 stated LAPLANTE is a drug user of suspected cocaine and marijuana and has observed LAPLANTE consuming drugs with BIMPSON at his residence at 655 Hilltop Road, Littleton, New Hampshire.

16.     Source #1 stated BIMPSON was the co-owner of M3 Cannabis Corp. in Bridgton, Maine and had a multi-acre marijuana grow operation in Bethel, Maine, which wholesaled large quantities of outdoor-grown marijuana to local medical marijuana businesses in Maine, however BIMPSON and fellow co-owner Michael MILLER ("MILLER") of Littleton, New Hampshire, also brought large quantities of marijuana into New Hampshire to sell at premium prices to fund other endeavors through ill-gotten gains, such as firearms and drug trafficking in Connecticut.

17.     Source #1 showed corroborating videos, photographs, and messages on their cellphone ("Telephone #1"), which were received from BIMPSON's known cellphone numbers, 207-804-0872 and/or 207-595-2356, and/or his known social media accounts, such as Facebook account #522139785940237 with the vanity name "Filipe Xlii." Source #1 also showed

5

investigators numerous videos and photographs captured and stored on Telephone #1, in which Source #1 was present during the events and documented the events firsthand. Investigators asked Source #1 if they would consent to an extraction of Telephone #1, to which Source #1 agreed to do so at a later date.

*BIMPSON's Criminal History*

18.     I reviewed BIMPSON's criminal history and observed him to have been arrested in New Hampshire, Maine, Vermont, and Massachusetts. I observed BIMPSON had numerous arrests to include: Theft by Unauthorized Taking (2015); Disorderly Conduct (2016); Burglary (2016); Receiving Stolen Property (2016); Controlled Drugs (2016); Burglary (2017); Violation of Probation (2018); Domestic Violence Reckless Conduct (2019); Domestic Violence Assault (x2) (2019); Fugitive from Justice (2020); Violation of Conditions of Release (Possession of Firearm) (2020); Tampering with Witness (2020); Drug Possession (Marijuana and Butane Hash Oil) (2022); and Unsworn Falsification (2022).

19.     I observed BIMPSON was convicted of felonious Tampering with Witness in Oxford, Maine Criminal Court (Docket #OXFCDCR202000124) on August 14, 2020, which was punishable by more than one year imprisonment. BIMPSON was sentenced to one year suspended sentence and two years' probation.

20.     I observed BIMPSON was convicted of Domestic Violence Assault in Oxford, Maine Criminal Court (Docket #OXFCDCR201900577) on August 14, 2020. BIMPSON was sentenced to 38 days of incarceration.

21.     As a result of these convictions I know through my training, knowledge, and experience that BIMPSON had been a person prohibited from possessing firearms and ammunition since at least August 14, 2020, pursuant to 18 U.S.C. § 922(g).

*Voluntary Extraction of Telephone #1*

22.     On or about August 31, 2023, Source #1 voluntarily provided Telephone #1 to

NHSP Troop F Detectives to have the contents extracted. Source #1 provided consent for law

enforcement agencies to review the contents of Telephone #1. On the same day, NHSP Detective

Tyler Brennan conducted the forensic extraction of Telephone #1 and provided the ATF with a

copy of the extraction.

*Voluntary Extraction of Telephone #2*

23.     On or about September 12, 2023, BIMPSON was arrested by NHSP in Gorham,

New Hampshire for outstanding warrants. During the arrest operation, Source #2 provided

information to NHSP relative to BIMPSON and his possession and distribution of firearms and

drugs. Source #2 voluntarily provided information, did not request, nor receive a monetary

reward, and did not receive favorable consideration for criminal cases. Source #2 stated they

knew BIMPSON for approximately a few years and were a former associate of BIMPSON's

DTO. Source #2's motivation for providing information was due to protect the community, to

include community members close to Source #2.

24.     Source #2 stated BIMPSON utilized his marijuana business in Maine to facilitate

the illegal trade of guns and drugs in New Hampshire and Maine. Source #2 stated BIMPSON

received firearms from a source in Littleton, New Hampshire. Source #2 showed corroborating

videos, photographs, and/or messages on their cellphone ("Telephone #2"), which were received

from BIMPSON's known cellphone number, 207-804-0872, and/or his known social media

accounts, such as Facebook account #522139785940237 with the vanity name "Filipe Xlii."

25.     On or about September 12, 2023, Source #2 voluntarily provided Telephone #2 to

NHSP Troop F Detectives to have the contents extracted. Source #2 provided consent for law

enforcement agencies to review the contents of Telephone #2. On the same day, NHSP Detective

Tyler Brennan conducted the forensic extraction of Telephone #2.

### BIMPSON – History of Drugs and Firearms

26.     I know through reviewing police reports, speaking with involved officers,

reviewing BIMPSON's social media accounts to include Instagram and Facebook, and reviewing

the content of Telephone #1 and Telephone #2, that BIMPSON has regularly consumed and/or

distributed marijuana, cocaine, and other drugs, such as suspected methamphetamine, ecstasy

and/or 3,4-Methylenedioxymethamphetamine ("MDMA") , and hallucinogens, to include

Lyesrgic acid diethylamide ( "LSD") and Psylocibin mushrooms, and has also been involved in

the illegal possession and trafficking of firearms.

27.     I am familiar with and able to identify BIMPSON in photographs and videos after

conferring with law enforcement personnel who have had professional involvement with

BIMPSON, and after viewing hundreds of photographs and/or videos to include multiple social

media accounts belonging to BIMPSON and/or associates, booking photographs, and

photographs from the contents of Telephone #1. I am familiar with the numerous different

appearances of BIMPSON to include varying hair lengths and styles, facial hair, and other

accessories to include clothing, hats, and face coverings.

28.     I reviewed Northborough, Massachusetts Police ("NPD") Report # 1900021351,

dated December 10, 2019, in which NPD contacted a motor vehicle in which BIMPSON was

identified as the operator. NPD officers observed what appeared to be a firearm in direct control

of the female rear passenger, later identified as Hailey BROWN, the mother of BIMPSON's

child. BIMPSON admitted during the incident that he was driving the front passenger, Brandon

LANZOFANO, a convicted felon from New Haven, Connecticut, from Maine to Connecticut. A

8

pat frisk of the vehicle revealed the suspected firearm was a BB gun. A pat frisk of a bag claimed by LANZOFANO to be his, yielded a Glock, model 22, .40 S&W caliber pistol, bearing serial number KYZ852 in the case with two 15 round magazines and no ammunition. BROWN stated she had purchased the firearm a day or two prior in Maine. BROWN later plead guilty to the possession of a firearm without a license and improper storage of a firearm. BIMPSON was also arrested for motor vehicle infractions. During the booking process, BIMPSON provided the cellphone number 207-595-2356.

29.    Based on my training and experience, firearms recovered in the possession of prohibited persons, who are in and/or from a different state in which the firearm was purchased is indicative of firearms trafficking. I know that the facts of the December 10, 2019 event, such as the original purchaser, BROWN, who purchased the firearm just a few days prior, and had relinquished possession of the firearm to a prohibited person from a different state, LANZFANO, is consistent with a straw purchase and/or firearms trafficking. I know that both BIMPSON and LANZOFANO were prohibited persons at the time of the incident and were not able to purchase or possess firearms themselves. I know that BROWN had no prior criminal history at the time of the event.

### *BIMPSON Instagram Accounts - @xliifilipe & @mack_lavoie*

30.    On September 7, 2023, I reviewed the public postings of the Instagram account of BIMPSON, under the username "@xliifilipe." I know through a recorded, Mirandized interview of BIMPSON on September 12, 2023, by NHSP that BIMPSON admitted to owning and posting to this account. I knew from Source #1 that "XLII" was the roman numeral for the number 42, which is BIMPSON's favorite number, tattooed on his person, and is part of his persona and personal "brand." I observed the following public posts to include:



a.  Posted November 2, 2020 – A video posted to @xliifilipe, depicted a male, suspected to be BIMPSON, holding what appeared to be a semiautomatic shotgun. In the video, the male, racked the shotgun, to enable it to fire and fired the shotgun four (4) times into the ground. The caption of the video read "Let this mf EAT." I know through my training, knowledge, and experience that the caption is in reference to shooting the firearm. I know the term "eat" to be in reference to a firearm being fired and "consuming" ammunition;

10



b.  Posted November 2, 2020 – A photograph posted to @xliifilipe, depicted a
suspected AK-type firearm of unknown make, model or caliber, with a distinct
painted wood foregrip, a detached vertical foregrip, a screwdriver, and an
extended magazine inserted into the firearm. I know through my training,
knowledge, and experience that the screwdriver and unattached foregrip depicted
in the photograph are indicative of a person modifying a firearm by adding or
removing accessories to the firearm.

c.  I know through my training, knowledge, and experience that persons often utilize
their cellphones to document photographs and videos, and the originals are then
retained on the device, which may be later uploaded to social media accounts. I
know that through cloud-based servers these photographs and videos may be
carried over to new devices obtained by the owner. I know that photographs and
videos saved to a person's cellphone may provide evidence as to when the video
or photograph posted to social media was actually taken. During the time the

11

above photographs were posted to social media, BIMPSON was prohibited from

possessing firearms.



d.   Posted November 2, 2020 – Videos and photographs posted to @xliifilipe,

depicted a series of posts related to controlled substances derived from marijuana,

such as butane hash oils ("BHO"), commonly referred to as "dabs," which contain

high concentrations of Delta-9-tetrahydrocannabinol ("THC"), the psychoactive

chemical in marijuana. The posts depict a large sheet pan of a yellow substance,

which I know through my training, knowledge, and experience, as well as

concurring with drug investigators familiar with this case, that the substance is

consistent with BHO and is of distribution quantities. Further, the photographs

depicting glass containers are consistent with how BHO's are packaged and

distributed. One photograph depicted BIMPSON, MILLER—who I recognized

through booking photos, driver's license photos and social media posts—and a

third male, suspected to be Cole DRAPER, a former interested party of M3

Cannabis Corp, each holding up large quantities of raw marijuana, consistent with

distribution quantities.

31.     On September 17, 2023, I reviewed the public postings of the Instagram account

of BIMPSON, under the username "@mack_lavoie." I know through Berlin Police Report #20-

229-OF, dated April 24, 2020, that BIMPSON has utilized the alias "Mackenzie Lavoie." I

observed Berlin Police Lieutenant Nathan Roy wrote in his report that during the incident,

BIMPSON showed Lieutenant Roy a social media account in the name "Mack Lavoie" which

depicted BIMPSON in the profile picture. I learned from Source #1 and Telephone #1 that

BIMPSON's primary email address was mackenzielavoie04@gmail.com. I observed the

following public posts by @mack_lavoie to include:



a.   Posted November 14, 2019 – a video posted to @mack_lavoie, depicting a male,
    suspected to be BIMPSON, holding a black suspected compact pistol, similar to a
    Ruger, model LCP compact pistol. The male was also holding a wad of U.S.
    currency, and a magazine loaded with what appeared to be ball ammunition.



14

b.  Posted May 5, 2020 – a video posted to @mack_lavoie, depicting BIMPSON

holding a black suspected Glock pistol, which I was able to identify through my

training, knowledge, and experience to include formerly being certified as a

Glock Armorer, and my utilizing and manipulating a Glock pistol as a

government issued duty weapon approximately daily since 2012. The caption of

the video stated, "Thought you werent supposed to be around firearms."



15



c.  Posted May 9, 2020 – a video posted to @mack_lavoie, depicting a large sum of US currency in all $20 USD bills. On the same day, a photograph was also posted to @mack_lavoie, depicting what appeared to be BHO with a caption on the picture that said "Hmu whenever." I know this to mean "Hit me up whenever," in reference to BIMPSON actively utilizing social media to sell BHOs. I know that posting illicit drugs, such as BHOs and large sums of cash on the same date is indicative of drug distribution.

### *BIMPSON Facebook Accounts – Filipe Xlii & Mack Lavoie*

32.  On September 7, 2023, I reviewed the public postings of the Facebook account of BIMPSON, under the username "Filipe Xlii." I learned from debriefs of Source #1 and Source #2 that Filipe Xlii is BIMPSON's primary means of communication via cellphones via the Meta Messenger application. I observed the following public posts to include:

16



33.    Posted October 3, 2021 – A picture posted to @xliifilipe, depicted BIMPSON utilizing a cellphone in a black case. BIMPSON commented on the photograph stating "…you know its always on go." During the September 12, 2023, recorded, Mirandized interview of BIMPSON on numerous occasions he stated in substance that his entire life and work was located on his phone.



34.    Posted October 14, 2022 – A picture posted to @xliifilipe, depicted a cartoon

17

skeleton, wearing a hat with a marijuana leaf and the name "Mack" an alias used by BIMPSON; a bandana around its neck with "M3" written on it, the company owned by BIMPSON; holding two revolvers, cash and marijuana plants in the background.



35.     Posted January 17, 2022 – A picture posted to @xliifilipe, depicted BIMPSON holding a large stack of US currency. I know from observing BIMPSON's multiple social media accounts that BIMPSON consistently posts photos or videos of large quantities of cash, despite having no other legitimately employment other than being a registered Maine Marijuana caregiver. Through basic research as well as speaking with law enforcement personnel familiar with outdoor marijuana cultivation, I know that harvest season for outdoor marijuana grow operations is typically during the month of October and the opportunity to make money is much more restricted than that of an indoor grow operation. The consistent posting of large sums of cash is indicative that BIMPSON has an additional cash-only business, such as dealing drugs and firearms.

18



36.     Posted March 31, 2022 – A picture posted to @xliifilipe, depicted what appeared to be a round of shotgun ammunition, resting on top of a tobacco leaf, commonly referred to as a "blunt wrap" and a green leafy substance, which through my training, knowledge, and experience, appeared to be marijuana. I know through Telephone #1, that the date, March 31, 2022, is significant to shotguns, as Source #1 filmed a Facetime with BIMPSON in which he was holding a magazine fed, black, AR-12-type shotgun.

37.     On September 17, 2023, I reviewed the public postings of the Facebook account of BIMPSON, under the username "Mack Lavoie." I know through Berlin Police Report #20-229-OF, dated April 24, 2020, that BIMPSON has utilized the alias "Mackenzie Lavoie." I observed Berlin Police Lieutenant Nathan Roy wrote in his report that during the incident, BIMPSON showed Lieutenant Roy a social media account in the name "Mack Lavoie" which depicted BIMPSON in the profile picture. I learned from Source #1 and Telephone #1 that

19

BIMPSON's primary email address was mackenzielavoie04@gmail.com. I observed the following public posts to include:



a. Posted February 6, 2020 – a series of photographs posted to the "Mack Lavoie" account, depicted mainstream clothing and a pistol with the caption "Me this summer." I know that BIMPSON was prohibited from possessing firearms at the time of this post.

*BIMPSON to Source #1 Conversations – Telephone #1*

35.     On or about August 30, 2023, I reviewed six (6) videos provided by Source #1, all dated August 29, 2023, due to being downloaded and/or screenshots, of prior messages sent from BIMPSON via the Messenger app, and received via Telephone #1 by Source #1. Upon further examination of Telephone #1, I learned most of the original and/or modification dates in which BIMPSON provided Source #1 the videos. I observed the context of some videos from text messages between BIMPSON's known phone numbers and Telephone #1. I observed that BIMPSON utilized registered Verizon Wireless phone number 207-595-2356 between March 27, 2020, and December 18, 2022, to contact Telephone #1. I observed that BIMPSON utilized registered Verizon Wireless phone number 207-804-0872 between June 27, 2022, and August 5, 2023, to contact Telephone #1.



36.     The video depicted BIMPSON, as identified by Source #1, due to his wristwatch, as seen in other videos, clothing and blue bankers' bag, which according to Source #1, he commonly carries cash in. In the video, BIMPSON is holding a German Sports Gun, model GSG-1911, .22 LR HV caliber pistol, bearing serial number A951448. On September 1, 2023, I learned through a trace of the firearm, that it was purchased by a Merek WEISENSEE, a individual known to the ATF and who commonly sold firearms via the secondhand market, such as Armslist or through social media.  WEISENSEE purchased this firearm on February 21, 2023, from Fieldmaster Firearms, LLC in Belmont, New Hampshire. According to Source #1, this firearm was acquired by BIMPSON from LAPLANTE in Littleton, New Hampshire and later sold to Jason WHITNEY in Groveton, New Hampshire approximately five (5) months prior, around April 2023.



37.     A video sent by BIMPSON on or about June 22, 2023, depicted BIMPSON

holding a Springfield, model Hellcat, 9x19mm pistol with a red dot sight and a loaded magazine

containing a round of an unknown brand of ammunition, suspected to be a 9x19mm round of

ammunition. According to Source #1 and as observed in Telephone #1, on that date, BIMPSON

and Source #1 went to 655 Hilltop Road, in Littleton for BIMPSON to receive the Hellcat pistol

from LAPLANTE and fire it in LAPLANTE's backyard.



38.     In the same conversation, on the June 22, 2023, I observed BIMPSON send a photograph to Telephone #1, which depicted BIMPSON, readily identified by his *Rick and Morty* tattoo on his wrist, holding what appeared to be a black unmarked silencer with a Ziploc bag containing small cylindrical metallic pieces, consistent with the baffles of a privately made firearm ("PMF") silencer. I observed the suspected baffles to have awl marks in the center of each piece, which are commonly used to guide a drill bit of whatever caliber the manufacturer of the PMF determines.

39.     In my experience, I have seized dozens of non-drilled, unfinished silencers, which the ATF Firearms and Ammunition Technology Division has classified as firearms, due to being readily converted into a functioning firearm under the National Firearms Act ("NFA"), 26 U.S.C. §§5801-5872. Source #1 stated the two (2) other pair of shoes observed in the photograph were those of Source #1 and of LAPLANTE. According to Source #1, LAPLANTE made "homemade" silencers, which are classified by the ATF as PMF silencers and which would be attached to firearms BIMPSON sold on behalf of LAPLANTE. I observed messages from BIMPSON to Telephone #1 on June 22, 2023, regarding "Chucky" having a surprise for BIMPSON. BIMPSON believed the surprise would be "my Hellcat."

40.     I know through my training, knowledge and experience that silencers are NFA firearms and therefore have to be registered to the National Firearms Registration and Transfer Record ("NFRTR"). I know that silencers are used to muffle the sound produced by the action of a firearm. I know that criminals utilize silencers to conceal their use of firearms in the commission of crimes. I know that firearms without serial numbers, such as PMFs, if they are within the definition and regulation of NFA firearms, such as silencers, cannot be registered to

the NFRTR, due to a lack of a serial number, and therefore are inherently illegal and cannot be possessed by anyone.



41.     A video sent by BIMPSON on or about August 9, 2023, depicted ten (10) unmarked receiver sets, which appeared to have been partially completed, and therefore would be considered firearms. According to Source #1, the video was filmed in LAPLANTE's garage at 655 Hilltop Road, Littleton, New Hampshire. I observed one of the lower receivers to be non-anodized metal, which is consistent with being manufactured as a PMF (also referred to as a "ghost gun."). I also observed a lower receiver in a metal guide, commonly referred to as a "jig." I know raw non-anodized metal and jigs are consistent with the manufacturing of PMF firearms from raw materials and or aluminum molds, referred to by the firearms industry as "80% receivers." I know that all ten receiver sets in the video are all consistent with PMF firearms, as there are no markings or legible serial numbers. That LAPLANTE was manufacturing firearms in his garage as depicted in the video of multiple partially completed PMF receiver sets is consistent with the statements made by Source #1 to investigators.

25

42.    I know through my knowledge, training, and experience that PMFs are firearms manufactured by non-licensed manufacturers, such as a private citizen. I know that PMFs were designed to be manufactured for individual purchase and manufacturing, such as "build-your-own" kits, for firearms enthusiasts. I know that these aforementioned kits can be purchased online and shipped right to an individual's residence and are not required to have a background check conducted, such as when an individual purchases a firearm from a Federal Firearms Licensee ("FFL"). I know that the aforementioned kits are designed to be completed to manufacture a firearm, as defined by Title 18 U.S.C. §921(a)(3). I know that PMFs are not required to be serialized by the non-licensed manufacturer. I know that selling PMFs cannot be done to earn a profit and/or engaging in the firearms license business.

43.    I know that criminals utilize PMFs to conduct criminal activity because PMFs can be bought, shipped, and manufactured at a person's residence, concealed from law enforcement. PMFs do not require a background check and can be easily obtained by prohibited persons. PMFs, due to not being serialized, cannot easily be traced like traditional commercially manufactured firearms, and therefore are easily concealed from law enforcement investigations.



44.     A video sent by BIMPSON on or about March 31, 2022, depicts BIMPSON, identified by his outfit, observed in numerous other videos, as well as by Source #1, holding an AR-type pistol, bearing no identifiable marks. Source #1 stated the video was taken from the inside of LAPLANTE's garage at 655 Hilltop Road, Littleton, New Hampshire. Source #1 indicated that BIMPSON had been receiving firearms from LAPLANTE for at least eighteen months, if not longer. The receiver of the AR-type pistol is consistent with the video of the ten (10) receiver sets sent by BIMPSON as recent as August 9, 2023. I know that people illegally manufacturing PMFs often utilize the same brands and companies due to limiting the kind of jigs and other tools needed to complete the firearm. In order to efficiently and cost-effectively make a large sum of PMFs, it would be most efficient to utilize the same brand and to buy material in bulk.

<u>*BIMPSON to Source #2 Conversations – Telephone #2*</u>

45.     I observed two specific videos on both Telephone #1 and Telephone #2 that were received from BIMPSON via the Messenger App:

46.     August 9, 2023 – the video depicting the ten (10) PMF unmarked receiver sets, taken inside LAPLANTE's garage at 655 Hilltop Road, Littleton, New Hampshire, as described in Paragraph 41.



47.     July 6, 2023 – Depicting BIMPSON, readily identified by his forearm tattoo, inside of a Scion vehicle, holding a Geisler Defence, model 1917, 9x19mm pistol, bearing no visible serial number, with distinct aftermarket accessories and modifications to include: an American flag slide; a gold barrel with "Join or Die" written on it with the rattlesnake in eight (8) pieces, commonly referred to as the "Join or Die" flag, symbolic of the Second Amendment and right to bear arms; a pistol light and laser; a custom trigger with a gold trigger safety; gold

extractor; gold slide cover plate; gold frame pins; and an extended magazine with a clear window containing an undetermined amount of ammunition.

48.     I observed LAPLANTE's Facebook profile to show a firearm with the same exact modifications, posted to his page on July 4, 2023, two days prior to BIMPSON's post.





49.     I observed BIMPSON comment 10 weeks prior "Mmmmm I cannot wait to see that thing EATT." I know BIMPSON to use this terminology in a prior social media post in reference to shooting the firearm and "consuming" ammunition.

30

50.     According to Source #1, the carpet depicted in LAPLANTE's photograph on his Facebook page is located in the garage at 655 Hilltop Road, Littleton, New Hampshire and can be observed in other videos and photographs sent by BIMPSON of firearms.

51.     According to Source #1, the video dated July 6, 2023, was inside of LAPLANTE's boxy vehicle. According to Source #2, LAPLANTE's vehicle is a box-style small SUV like the one with "hamsters in the commercials." I learned through a search of registered vehicles to LAPLANTE, that he is the active registered owner of a 2008 white Scion xB, bearing New Hampshire registration 5158661 (VIN: JTLKE50E681058921), which was registered on August 25, 2022.

52.     I observed additional videos of BIMPSON, identified by his voice and tattoos, inside of a vehicle with a similar dashboard and distinct round air vents and could observe the steering wheel to show the Scion logo. In one of the videos (unknown date), BIMPSON narrated he was "sitting here at the apartments in Whitefield…Chucky had to go, stop here…he's [Chucky] been in there for ten fucking minutes." I know that LAPLANTE's nickname is "Chucky."

31



53.     I know through my training, knowledge and experience that the firearm depicted as discussed above, Giesler Defence, model 1917 pistols are made as PMF kits, to be completed by the purchaser and originally manufactured in Israel. I know that Giesler Defence only makes PMFs and does not make completed firearms that are imported into the United States. I know that this is consistent with Source #1 and Source #2's statements that LAPLANTE makes "ghost guns" (or PMFs), which BIMPSON then sells.

*BIMPSON Messages - Drugs*

54.     I observed numerous photographs on Telephone #1 and Telephone #2 that depicted suspected drugs in distribution quantities as well as cash. I observed large quantities (multiple pounds) of marijuana, as well as white powder substances, consistent with cocaine and dark rock-like substances, suspected to be methamphetamine. Source #1 and Source #2 both confirmed that BIMPSON and MILLER had a suspected cocaine connection in Connecticut,

32

supplying a "brick," known for slang for one kilogram, as well as BIMPSON being arrested on

December 10, 2019, while enroute to Connecticut with a firearm in the car and LANZOFANO as

a front passenger.





55.     I know through my training knowledge, and experience that firearms are often traded for drugs. I know that New Hampshire and Maine are often considered source states for firearms, due to less stringent purchasing requirements. I therefore know that firearms purchased in New Hampshire and Maine are often trafficked south to states with more stringent laws, such as Massachusetts, Connecticut, and New York. As a result, I know that it is not uncommon for firearms accompanied by little to no illegal drugs to be interdicted going southbound while drugs are regularly interdicted going northbound.

## TECHNICAL TERMS

56.     Based on my training and experience, I use the following technical terms to convey the following meanings:

a.  Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also

include global positioning system ("GPS") technology for determining the location of the device.

b.  Digital camera:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media include various types of flash memory cards or miniature hard drives.  Most digital cameras also include a screen for viewing the stored images.  This storage media can contain any digital data, including data unrelated to photographs or videos.

c.  Portable media player:  A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.  However, a portable media player can also store other digital data.  Some portable media players can use removable storage media.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can also store any digital data.  Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.  GPS:  A GPS navigation device uses the Global Positioning System to display its current location.  It often contains records the locations where it has been.  Some GPS navigation devices can give a user driving or walking directions to another

35

location.  These devices can contain records of the addresses or locations involved

in such navigation.  The Global Positioning System (generally abbreviated

"GPS") consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite

contains an extremely accurate clock.  Each satellite repeatedly transmits by radio

a mathematical representation of the current time, combined with a special

sequence of numbers.  These signals are sent by radio, using specifications that

are publicly available.  A GPS antenna on Earth can receive those signals.  When

a GPS antenna receives signals from at least four satellites, a computer connected

to that antenna can mathematically calculate the antenna's latitude, longitude, and

sometimes altitude with a high level of precision.

e.  PDA:  A personal digital assistant, or PDA, is a handheld electronic device used

for storing data (such as names, addresses, appointments or notes) and utilizing

computer programs.  Some PDAs also function as wireless communication

devices and are used to access the Internet and send and receive e-mail.  PDAs

usually include a memory card or other removable storage media for storing data

and a keyboard and/or touch screen for entering data.  Removable storage media

include various types of flash memory cards or miniature hard drives.  This

removable storage media can store any digital data.  Most PDAs run computer

software, giving them many of the same capabilities as personal computers.  For

example, PDA users can work with word-processing documents, spreadsheets,

and presentations.  PDAs may also include global positioning system ("GPS")

technology for determining the location of the device.

36

f. Tablet:  A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen.  Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise.  Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions.  Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

g. Pager:  A pager is a handheld wireless electronic device used to contact an individual through an alert, or a numeric or text message sent over a telecommunications network.  Some pagers enable the user to send, as well as receive, text messages.

h. IP Address: An Internet Protocol address ("IP address") is a unique numeric address used by computers on the Internet.  An IP address is a series of four numbers, each in the range 0-255, separated by periods (*e.g.*, 121.56.97.178).  Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

i. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet,

connections between devices on the Internet often cross state and international

borders, even when the devices communicating with each other are in the same

state.

57.     Based on my training, experience, and research, I know that the Device has

capabilities that allow it to serve as a wireless telephone, digital camera, portable media player,

GPS navigation device, and PDA.  In my training and experience, examining data stored on

devices of this type can uncover, among other things, evidence that reveals or suggests who

possessed or used the device.

58.     Based on my training and experience, I know that drug traffickers typically use

cellular telephones in order to facilitate drug transactions, including to order and take orders for

controlled substances or to set up shipments. I am aware that items such as cell phones and U.S.

currency are often located in a residence or on an individual's person. I am also aware that drug

trafficker may use computers to facilitate drug transactions much in the same way they would

use a cellular telephone.  In addition, I am aware that drug traffickers may order and

communicate with their sources of supply via computer.

**ELECTRONIC STORAGE AND FORENSIC ANALYSIS**

59.     Based on my knowledge, training, and experience, I know that electronic devices

can store information for long periods of time.  Similarly, things that have been viewed via the

Internet are typically stored for some period of time on the device.  This information can

sometimes be recovered with forensics tools.

60.     There is probable cause to believe that things that were once stored on the Device

may still be stored there, for at least the following reasons:

j.   Based on my knowledge, training, and experience, I know that computer files or

     remnants of such files can be recovered months or even years after they have been

     downloaded onto a storage medium, deleted, or viewed via the Internet.

     Electronic files downloaded to a storage medium can be stored for years at little

     or no cost.  Even when files have been deleted, they can be recovered months or

     years later using forensic tools.  This is so because when a person "deletes" a file

     on a computer, the data contained in the file does not actually disappear; rather,

     that data remains on the storage medium until it is overwritten by new data.

k.   Therefore, deleted files, or remnants of deleted files, may reside in free space or

     slack space—that is, in space on the storage medium that is not currently being

     used by an active file—for long periods of time before they are overwritten.  In

     addition, a computer's operating system may also keep a record of deleted data in

     a "swap" or "recovery" file.

l.   Wholly apart from user-generated files, computer storage media—in particular,

     computers' internal hard drives—contain electronic evidence of how a computer

     has been used, what it has been used for, and who has used it.  To give a few

     examples, this forensic evidence can take the form of operating system

     configurations, artifacts from operating system or application operation, file

     system data structures, and virtual memory "swap" or paging files.  Computer

     users typically do not erase or delete this evidence, because special software is

     typically required for that task.  However, it is technically possible to delete this

     information.

39

m.  Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

61.  *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how each Device was used, the purpose of its use, who used it, and when.  There is probable cause to believe that this forensic electronic evidence might be on the Device because:

n.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

o.  Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

40

Case 1:23-mj-00183-TSM   Document 1-1   Filed 10/13/23   Page 110 of 114


p.   A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

q.   The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

r.   Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

s.    I know that when an individual uses an electronic device to obtain drugs or firearms, the individual's electronic device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime.  The electronic device is an instrumentality of the crime because it is used as a means of committing the criminal offense.  The electronic device is also likely to be a storage medium for evidence of crime.  From my training and experience, I believe that an electronic device used to commit a crime of this type may contain: data that is evidence of how the electronic device was

41

used; data that was sent or received; and other records that indicate the nature of the offense.

62.     *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

63.     *Manner of execution.*  Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## **CONCLUSION**

64.     Based on the foregoing, there is probable cause to believe that the Device, described more fully in Attachment A, contains items described in Attachment B that constitute evidence, fruits, or instrumentalities of violations of 18 U.S.C. § 933 (firearms trafficking), 18 U.S.C. § 922(g)(1) (unlawful possession of firearms), 18 U.S.C. § 922(g)(3) (unlawful possession of firearms), 18 U.S.C. § 922(g)(9) (unlawful possession of firearms),  21 U.S.C. 841(a)(1) (distribution and possession with intent to distribute controlled substances), and 26 U.S.C. § 5681(d) (unlawful possession of unregistered NFA firearms).  Accordingly, I respectfully request that this Court issue a search warrant authorizing the examination of the Device described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

/s/ Patrick Dawley
Patrick Dawley
Special Agent
Bureau of Alcohol, Tobacco, Firearms,
And Explosives


Subscribed and sworn to before me telephonically on September 27, 2023:

UNITED STATES MAGISTRATE JUDGE

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by Meta Platforms, Inc. ("Meta"), and my title is _____. I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of Meta. The attached records consist of _____ ]. I further state that:

a.      all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of Meta, and they were made by Meta as a regular practice; and

b.      such records were generated by Meta's electronic process or system that produces an accurate result, to wit:

1.      the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of Meta in a manner to ensure that they are true duplicates of the original records; and

2.      the process or system is regularly verified by Meta, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____        _____
Date                                   Signature